The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Mr. Bensheer. Yes, you may be seated. Good morning, and may it please the Court. Sam Mancina on behalf of the appellant, Preston Mills. The district court revoked Mr. Mills' term of supervised release and sentenced him to 24 months of imprisonment because it concluded that he had committed two crimes he was acquitted of by a state court jury. The district court committed two reversible errors. First, its factual findings rested on a clearly erroneous premise, that the government's key witness gave consistent testimony in state court and federal court. Second, the district court sentence was plainly unreasonable because it failed to address one of Mr. Mills' non-frivolous mitigation arguments. I'd like to start with the factual issue first. There's a lot of facts in this revocation case, but I'm going to try and drill down on the precise, clearly erroneous factual finding. Mr. Mills was accused of strangling and assaulting his then-girlfriend while he was on supervised release during an argument. The report to the police came over a year after the incident, and the testimony at issue here was about what led up to his then-girlfriend reporting the crime, Jessica Rodriguez, Ms. Rodriguez. In state court, she testified that she reported Mr. Mills to his probation officer after his estranged wife, Mrs. Mills, came to visit her at her work. And this is at JA 696. She was asked, what day did you report? And she said, the day after Mrs. Mills showed up at my location. That's what she testified to in state court. In federal court, she very clearly testified that the ex-wife, Mrs. Mills, showed up after she had reported Mr. Mills to his probation officer and the police. And that distinction matters because it goes to Ms. Rodriguez's credibility and her motivations for testifying, and the district court did not acknowledge this inconsistent testimony. In fact, the district court said at JA 347 it isn't inconsistent because it's consistent with something she said earlier, and that's just factually wrong. The district court messed that fact up, and it undermines its ultimate finding that Mr. Mills committed the crimes that he was acquitted of in state court. And in particular, I guess, we are challenging the strangulation, which is the grade A violation. What about the text messages, the daughter's testimony, the photographs? The district court seemed to take all of that into consideration. That's true, but the district court still has to reckon with impeachment evidence of the government's star witness here. Ms. Rodriguez was the only one with personal knowledge of the incident. She's the accusing party, and so her credibility and her testimony is sort of the linchpin of the case for the government. And when there's clear impeachment evidence, the district court at the very least has to account for it and take it into account. If it ultimately concludes that the other evidence is more than enough or sufficient, it can do that. But here the problem is it didn't even acknowledge the impeachment evidence. It sort of incorrectly found that there wasn't any impeachment, which, again, is just wrong if you look at the testimony that she gave, which is in the transcripts that the district court had. And so this isn't kind of a typical credibility case where you're looking at demeanor or the inflection of someone's voice. The district court was presented with two transcripts, the state court transcript and the federal court transcript, and was just asked to compare them and got the facts wrong. And so that's something that this court can review. And when a district court makes a clearly erroneous finding like that, it warrants reversal. I don't know if the district court didn't consider them. I think the district court said that they were immaterial and did not affect Rodriguez's credibility. I believe that's at J343. And the district court, the testimony relating to Ms. Mills and her motivations to report Mills was not inconsistent. So I think the district court did consider the testimony and the impeachment testimony. It just found that it was inconsistent and immaterial. So, Your Honor, I think- It wasn't inconsistent and immaterial. Yes. I think on JA347, which is where the district court was sort of going through the different impeachment evidence and making a ruling, it said on the fourth issue, which is the issue I've been talking about, sort of when the ex-wife showed up at Ms. Rodriguez's place of work, which was a Wawa convenience store. He says on JA347 from lines 12 to 17, he says, well, that isn't inconsistent because it's actually consistent with something she, meaning Ms. Rodriguez, said earlier, that Ms. Mills had come in earlier than the time she did the singing. Again, it gets a little complicated. But in federal court, she said that after she reported the crime, Ms. Mills came into her work and was sort of singing and humming a song. But then in state court, she said, Ms. Mills came in the day before and the day that I decided to report the crime, which seems sort of like it was the impetus or the action that spurred the reporting. So that's a discrepancy. And he's saying it's actually, it isn't inconsistent. So his finding is that there was no inconsistency, which is wrong. And also, there's no evidence that she said, Ms. Rodriguez said, that Ms. Mills had come in earlier than the time she did the singing. There's nothing in the record to support that finding. That's a clearly erroneous fact. He does go on to say, to the extent there is any inconsistency, it's an immaterial variance. It just recites an event to which anybody could make a mistake. Again, I think that's wrong. Ms. Rodriguez was adamant in both places. In state court, she was adamant that Ms. Mills came in before she reported. And in federal court, she was adamant that she came in after. She was actually asked to clarify on JA-128 whether she reported before, or whether Ms. Mills came in before or after. And she said she came in after. And then again on JA-143 during Cross, she said, did you report to the probation officer after you saw Ms. Mills in the Wawa? And she said no. So there's a clear discrepancy. And the district court's initial finding was there was no discrepancy. But I think what the district court says is immaterial because as to whether or not the strangulation occurred or not. What Ms. Mills did in coming into the store, I think the district court says is just immaterial. I think the district court didn't seem to understand the importance of it because Mrs. Mills and Ms. Rodriguez had sort of an acrimonious history that they both admitted. They did not like each other. They were constantly fighting over text message, over Mr. Mills. They actually got into a physical altercation before, which they both admitted to on the record. And so I think in state court, when the jury heard that she decided to report the day that Mrs. Mills came in. The district court heard all this stuff, right? It did hear all of it, yes. So wouldn't that just go to the weight of the evidence when the district court makes its credibility finding? Well, the district court, I guess, did not acknowledge that there was a credibility issue to begin with. It didn't seem to acknowledge that there was an inconsistency because it said it wasn't inconsistent. I thought it found the girlfriend, I can't remember her name, found her credible. Yes, it did find her credible. But I guess that's the issue we would raise is that it didn't take into account that she gave inconsistent testimony in state court. That she gave a different version of events in state court. It seemed to dismiss that and say, well, it's not inconsistent. And again, if you look at the record, there's clearly a discrepancy about when she decided to report. And Mrs. Mills, the ex-wife's role in that decision to report. And again, I think here it's important to be careful about something like this impeachment evidence. When you have a jury acquitting Mr. Mills of the crime, right? There's not the same procedural protections during a revocation proceeding. There's a lower burden of proof. The rules of evidence don't apply with the same force. And so the district court should have been extra careful that it was considering all the evidence. And if there was evidence that the state court jury heard that it didn't, it should have taken that into account. And at least acknowledged it when it was reaching the decision. Even if it ultimately was going to conclude the strangulation occurred. If there's credibility issues with a key witness, the star witness, the only witness with personal knowledge. The district court has to account for that. And at least take it into consideration. I think the district court did. The district court said that the delay, the district court said that Roy Regas was credible. Regardless of the delay in her reporting. And the court specifically addressed the delay and observed that it was common in cases of domestic violence. So I don't know how you say that that's not taking it into consideration. I think the district court took the delay, the year-long delay. But it didn't take into consideration the discrepancy in the testimony about when the ex-wife showed up at work. And what led to her ultimately reporting the crime. And in federal court she made it seem like it was only Mr. Mills' actions that led her to reporting it. That he was showing up at her work. That he left her a voicemail in May. And then a couple of weeks later she decided to report him. But in state court the version she gave was he did all those things. And then his ex-wife, who the jury knew that she really did not like. That she had gotten into a physical fight before with, showed up. And then that day she decided to go report Mr. Mills. And so that, again, goes directly to the key witness's credibility. And when you have key impeachment evidence like that, the district court has to consider it. So it did consider the delay. But it didn't consider the impeachment evidence or the inconsistency in her testimony. Even though it was presented to the court, it erroneously found there was no inconsistency. If there are no further questions about the factual finding, I'd like to briefly touch on the sentencing issue. Mr. Mills was on supervised release for an additional 19 months while his state court trial was pending. And so he spent that additional time. And he fully complied with the terms of his supervised release. He had negative drug tests. He was gainfully employed the whole time. And he raised this issue at sentencing and argued that it warranted a lower sentence. And the district court failed to address that argument at sentencing or during its sentencing explanation. I will note that the parties did discuss extensively during the multiple revocation hearings whether it was permissible for the court to extend the term of supervised release. And they concluded under 18 U.S.C. 3583I that it was. But whether it's legally permissible to extend the revocation period past its expiration date is separate from whether under the 3553A factors the court had to consider that extension in fashioning its ultimate sentence and whether it impacted, you know, protection of the public or deterrence or something like that. And the court simply failed to bring it up. So your argument here is a procedural result of this argument. My client had a legitimate mitigation claim. We put it on. District court did not consider it. That's your claim. It's not a substantive reason. No, it's not a substantive. We're making a procedural reason for this argument. And so under this court's precedence, they've repeatedly said there's plenty of cases. We cited some of them. Slappy, Patterson. If the district court fails to address a non-frivolous mitigation argument, that's a procedural error. And it's plainly unreasonable under this court's precedence. If there are no further questions, I can reserve my time for rebuttal. Yes, thank you. Thank you. Thank you, Mr. McKeon. Ms. Nolan. Good morning. May it please the court. My name is Olivia Norman. I'm an assistant United States attorney, and I represent the United States in this matter. I apologize in advance for my hoarse and coughing. It's just allergies. I'm not contagious. First, with regard to the credibility findings by the court, the defense focuses primarily on, one, what they say is an inconsistency in testimony. But, in fact, the district court went through painstakingly through the transcript of Ms. Rodriguez's testimony, the victim's testimony, at the original supervised release evidentiary hearing and compared it almost line for line from the transcript of the state proceeding. And in doing so, what the court realized was the original questions that were asked of Ms. Rodriguez was, was Mr. Mills, the defendant in this case, showing up at her work at Wawa? And did anybody else show up at her work at Wawa? And her response in federal court was, yes, after I had filed the complaint, Mrs. Mills showed up, came back to the coffee area, and was humming a song. And when I, when she saw me, because she was working back there, she started humming louder and then walked out. That was the testimony with regard to a June 11th incident that had occurred after the complaint had been made about the assault. What she had also said, though, at the original testimony, in her original federal testimony, and also in the state testimony, was that the reason why she finally filed a complaint, even though it was almost a year later, or it was a year later, was because Mr. Mills kept, wouldn't let go. She had told him, leave me alone. Stop bothering me. And he would continue to show up at the Wawa. And in May of 2022, he called and left her a voicemail. Even though she had his number blocked, this voicemail had come through where he was making statements to her about her oldest son getting arrested. And she was spooked by that because it showed that he was still kind of stalking her, keeping track of what was going on in her life. So that concerned her. She also said that a family member of his had come in, and that was the day that she had made the report. In state court, she clarified that that family member was Ms. Mills, who had come in. But she did not come back to the coffee station that time. She was at the front, just to the register, had come into the Wawa, went to the register, and left. Now, the district court did not specifically say, this is the transcript page number, and this is where I found this, and this is where I found that. But what the district court did find was there were two different trips that Ms. Mills made to the Wawa. The one where she went to the register on June 3rd, which was the day of the initial complaint. And the one where she came into the Wawa on June 11th, which is when she came back to the coffee station and she was humming and singing. That is significant, not because is it material when Ms. Mills came to the Wawa or not. What was significant is that when it was raised by the defense that there was a possible inconsistent statement, the district court spent hours going through saying, show me exactly where it was inconsistent. And went through line for line and made factual findings. And the district court's factual finding was there were two Wawa trips. And that we see at JA, that finding is at 346 and 347. So the district court, the significance of the whole thing is not that there were, that Ms. Rodriguez said that Ms. Mills came in on June 11th or that she came in on June 3rd. In fact, she said she came in both times. What is significant is that the court took the time to go through each and every alleged inconsistency and found, based on his analysis of the transcript, that there were no inconsistencies. He specifically found there was no inconsistency here. And if, in fact, there had been some mistake about the timing of this, it was not significant enough to impeach. I think we also have to look at this, though, in the context of what the rest of the evidence was. Among the evidence included that the court considered was Mr. Mills himself, his testimony himself. When he testified after his state proceedings were through, he then testified in the district court supervised release revocation hearing, in that separate evidentiary hearing. And in that hearing, Mr. Mills admitted to what had happened that night. He admitted that they had gone out for dinner, that when they came back, they discussed the truck, and that he was concerned that she was going to keep the truck because it was in her name. And he confirmed all of that and even confirmed that he had, in essence, in his terms, assaulted her because he claimed that she had dropped the keys to the truck down her pants and he had to get and grab those keys out of her pants. So he himself admitted that something had happened that night. So it wasn't just the uncorroborated testimony of Mrs. Mills. It was that she said that what happened was that he assaulted her, kicked her, strangled her, choked her. That it stopped when her daughter banged on the door. No one is saying that no one banged on the door. That testimony was also credited by the district court judge. The daughter testified that her mom's voice sounded raspy and she came running out of the room. Then there were this host of text messages. And we can just talk about the text messages in the abstract and say, well, there were text messages back and forth. But when we really read those text messages and what was actually said, she said, we're through. You kicked me. You hit me. You strangled me. We're done. And his response was, sorry, I knew better. So it wasn't just her testimony that the court credited. It was her testimony. It was her daughter's testimony. It was the text messages that were sent in the early morning hours just following the assault. It was also that there was a 911 call that night. And the police showed up that night. She turned him away and said, he's gone. We're done. I'm fine. And she didn't file a complaint. The counsel, you know, you did a fine job, both of you, in terms of the trial within the trial, the middle trial. But, you know, the Citizen Commission has really said that we're just kind of rather disfavored about this acquitted conduct situation. And, you know, I think perhaps our founding founders would sort of roll over in their graves and think that we're, since they put so much detail in the right to account of jury trials and all those fairness, said now we're sentencing people based on what they were acquitted for. And it's very disfavored because, you know, I know when I practiced law, they said, you know, a juror passed between you and the court, and therefore they'll make a judgment, and then they'll say no more. But now we've got a trial. I don't know. It's kind of difficult because basically you could say, you know, I'm not just hypothetically, I would say the judge said, you know, you were acquitted. But, you know, looking at you now, the way you talk to me, and this is hypothetically, I think you did. That's all that would have to happen. By preponderance of the evidence, I think you did. I've looked over the record in terms of the record and trial type thing, and 12 independent people who were sworn to do all those things found you not guilty, but I find by preponderance you did. That's really all it requires, isn't it? Well, and it is. But that is by law, right? That's 18 U.S.C. 3583 E3. It says that the court shall find by a preponderance of a violation of supervised release. What's required for a conviction and sentencing for that conviction, right? We have to have a conviction, and that is proof beyond a reasonable doubt. And what the Sentencing Commission said was that we're not going to consider relevant conduct, acquitted conduct, in federal court. Not what happened in state court someplace else. What the guidelines are talking about is including in relevant conduct, i.e., the conduct that you're going to get sentenced on, conduct that you were acquitted of in that federal trial. And that makes total sense because we're talking about a conviction of a crime and what the sentence should be for that offense, that conviction. But in the supervised release arena, we're not actually talking about a conviction of a crime. The question that the court has to consider is, did this person, first of all, was he on supervised release? Did he have a condition? And did that condition get violated? Did he violate that condition? It's not. And it gets a little fuzzy sometimes when we talk about don't commit any more state, federal, or local crimes because all of us in the criminal justice field are saying, oh, you have to prove a crime beyond a reasonable doubt. That's true. But that's not what this judge is doing. But in this case, correct me if I'm wrong, y'all had worked something out for 18 months, I think, right? And they agreed on it, and the court said, no, I can't take this because he may not get enough. This may not be enough. So it was dependent upon if he was looking for a conviction or not, or a result, right? Well, am I right about that? Yes, absolutely, the court does. So it is. It's dependent upon what happened in that state court. Yes, but it could have also gone to the other direction as well. And the real reason the judge wouldn't take that was because Mr. Mills felt that he could not fully, he could not plead guilty in the federal court without basically waiving his Fifth Amendment rights. Because if he said, yes, I did it for the purposes of federal court, for purposes of saying, did you violate supervised release or not, he was concerned that that would be used against him in the state court proceeding. So what he was going to do was plead no contest, and the parties were going to agree to 18 months. And the judge did not want a no contest or a no contendere type plea to the supervised release violation. Why not? That wouldn't have changed what the range of the court could have sentenced him to. No, it wouldn't have. But I think what it would have changed is that the court would have not heard the testimony and the evidence to know fully all of the factors that the court needed to consider on just how bad was this violation of supervised release. Not how bad was the crime, but how bad was this violation of supervised release. Well, he should have found not too bad because the court said, the jury said, not guilty. That should have helped him. Instead, it must have hurt him. Well, but in fact, I mean, we really cannot. I mean, we're talking about separate sovereigns here. We don't know what happened in the state court. Yes, we don't know. No, I mean, I'm sorry. I'm sorry. We don't know that he was found not guilty. He was found not guilty. What I meant by that is we don't know how the case was presented in state court. We know that we don't know how well the evidence was presented. I mean, we have some transcripts, but we also don't know to what extent was there some jury nullification. We don't know any of those things because it's a separate sovereign and we weren't there. Well, why were you waiting for it then? Didn't the court know that he wasn't going to be there for the trial anyway? All those things you said may be true, but then why wait then?  But that is something that happened in a separate court under a separate sovereign. I know that, but it was tied in this record to it by the court. It was. But the difference is. . . And, therefore, nothing is new to his benefit when it came out that, ooh, he was found not guilty. Beyond a reasonable doubt. Yes, sir. Yeah, exactly. But then that's what counsel said. What do you consider those things in terms of fully a chance to look at that and really should have brought it down? Well, certainly, if that is what the law should be, then Congress needs to act. Because 3583E says that the court shall find by a preponderance of the evidence. Not proof beyond a reasonable doubt. And it may very well have been that the jurors were sitting there and we don't know this. And this is why we don't second guess a jury. But the jury could have said, you know, we're pretty sure that everything she said was correct. And we're pretty sure that this all happened. But is there a possible doubt? Yeah, there's a possible doubt. It's possible we could doubt that it happened. And so that's the difference between preponderance, which is the standard set by Congress. I know what preponderance is. I know that. Beyond a supervisor. And also the difference in terms of, you know, you really don't have much of a chance, do you? I mean, you've got to go through the gauntlet and just really. . . We don't know what the judge considered either. Well, we do. Well, you said we don't know what the jury did. You speculated nullification, poor presentation, all those things. Can those things be on the other side too, the judicial side? Certainly. But we are actually. . . I'm sorry. We're supposed to be. . . It's always pristine when it's the judge. But we are here today looking exactly at what the judge did in our court. What was the violation? What was the parole violation, supervisor? It was. . . What did he do in violating that? Which one? He. . . He committed a crime? He was violating a crime? He committed a crime. It's not a conviction. Was it? No. No, we know it was not a conviction because it was found not guilty. But supervised release requires him not to commit any future crimes. It doesn't say don't get convicted of future crimes. So the crime was that he. . . But he says that he. . . That he. . . That she. . . Strangulation. Had the keys. Right. And that's what he said. Well, he admitted that. And the defense admitted that too. What they didn't admit was the strangulation. They admitted that the assault occurred. He admitted on the stand that the assault occurred. The only thing that they said did not occur was that he didn't choke her. But there were pictures of bruises around her neck. There was the raspy voice. There was a not recovering from the raspy voice that took her to the doctor. There were the text messages that said, you kicked me and hit me and choked me. And no response back saying, no, I didn't. If somebody accused. . . Typically if somebody accuses you of choking you and you're like, I didn't choke you. That's your first response. But that's not what he responded. If it pleases the court, I do want to move on to the sentence not being plainly procedurally reasonable. Because I only have a few minutes. But the most important thing here is that when we look at what the sentence was imposed. . . First and foremost, the judge departed downward from the advisory guideline range. The guideline range was actually 37 to, I think it was 53 months. Sorry, 37 to 46 months. Counsel, in our threshold issue, even if there's a downward departure. . . The threshold issue is, was there a mitigation issue, a legitimate mitigation issue? Was it presented to the court? And did the court rule on it? And here, there are several places in the record, it looks like to me. . . Where the defense raised this extended supervised release. Kind of different from other cases. The government raised it. JA 744 and 745. And they identify the issue before the court at the hearing. As to whether the court should consider the amount of Mr. Mills' term of supervised release. And they go on to identify how long it was. What I'm not seeing is where the court said. . . I mean, obviously, he's aware of the issue because it told counsel to brief it. I'm not seeing where the court said, okay, I've considered this. And this is how it factored into the decision on the term of imprisonment. So the context of raising that additional 19 months, 18 months on. . . Or almost 20 months on supervised release. Was that during that entire time period, that he was of good behavior. He didn't have new violations. He was taking care of his children. He was fully employed. All of these were elements that the court responded to. What the court did not specifically say is, I'm going to give you a reduced sentence because your supervised release was extended. But he did recognize. . . That's what the defense asked for. I would submit to the court that he's been punished sufficiently by being on supervision. And you're saying that he's guilty, but the punishment is adequate. That is my statement. Yes, Judge. So, I mean, there's probably a lot on the record that the judge could have cited that said. . . You know, you've already gotten all the consideration you're going to get. Or I've taken it into consideration with the sentence I'm imposing. But the problem, it seems like to me, is that the judge never said those things. He did not use those specific words. But at 760, he said, I studied the file. I considered all the arguments of counsel. And that have been submitted. The evidence has been submitted. And Mr. Mill's statement. And so he had considered all of those things. And the arguments and furtherance of that good behavior during that time period. The other thing, though, that is that the court is not required to consider non-mitigating. Just sort of neutral, if you will, factors. Or he's not required to specify them. The court clearly acknowledged over and over again the extended period of time. . . Or the extension of the supervised release period. But he's not required. And, in fact, he's actually prohibited from considering the time spent on supervised release pre-incarceration. . . As for credit for incarceration. And that's also 3583E3. This is without concern for the time spent on supervised release. So while the court clearly acknowledged that he spent an extended period of time. . . What the court did do was consider all of the good things that Mr. Mill's did during that extended period of time. That he was without new violation. That he was supporting his children. But he also found that, nonetheless, deterrence. . . The factors of deterrence and the need to protect the public were going to require incarceration for this violation. And it was based on that, that the judge imposed the term of 24 months. And we're asking this court to affirm that decision. To affirm the findings of the court. And to affirm the sentence. Thank you, counsel. Thank you. Mr. Machino, you have some time reserved. May it please the court. Just a few quick points on rebuttal. First, on acquitted conduct. We aren't raising an acquitted conduct challenge or a constitutional challenge. But I do think the fact that there was an acquittal. . . Drives home the point that the district court needs to be careful and get the facts right. Especially when you have a lower burden of proof. And less procedural protections. After someone's been acquitted of that conduct. And the district court here waited for the state trial court. They waited for the jury to reach its verdict. And then once it's reached its verdict. . . It still decided to find Mr. Mill's guilty and punish him. And in doing so, it made a clearly erroneous factual finding. And I think the government clarified. It said the district court found that there was two wah-wah trips from the ex-wife. And that is clearly erroneous. There is nothing in the record. . . And the government cites to nothing. . . That shows she ever testified there was two wah-wah trips. In federal court, she said there was one wah-wah trip. And it happened after she reported. In state court, she said someone showed up on June 3rd. And then later she clarified, the ex-wife showed up on June 3rd. . . Before I reported. And that's the discrepancy. The district court. . . Yes, it took the time to consider it. It did look at it. It got it wrong. Even if a district court is taking the time and being thorough. . . If it gets the facts wrong. . . It's wrong. And that's clearly erroneous. And because it goes to the key witness's credibility. . . That's a reversible error. And I would like to briefly just touch on the sentencing issue. The government argues that the court said at one point. . . That it considered Mr. Mills' arguments. That kind of boilerplate language isn't enough to just say. . . I considered the 3553A factors. And I considered everyone's arguments. It has to actually address specific non-mitigation arguments. Patterson's a good case there, right? A failure to just mention the arguments is enough. The district court here failed to mention his non-frivolous mitigation argument. And as a result, its sentence is procedurally unreasonable. If there's no further questions we'd ask. . . That you would vacate and remand. Thank you, Mr. McKenna. We appreciate your argument. And we know that you are. . . Although you're in the Federal Defender's Office. . . Thanks for taking the assignment. We appreciate them helping us out. And we acknowledge Ms. Norman's representation of the United States. We'll come down and greet counsel. Proceed so I'll file a case for the deterrent.
judges: Roger L. Gregory, G. Steven Agee, DeAndrea Gist Benjamin